CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 3 0 2012

JULIA C. DUDLEY CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **CHARLES KING,** | ) | **Case No. 7:09-cv-00410** |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| v. | ) | |
| | ) | **By: James C. Turk** |
| **FLINN & DREFFEIN ENGINEERING** | ) | **Senior United States District Judge** |
| **CO.,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Flinn & Dreffein Engineering Co.

("F&D")'s Motion for Summary Judgment. Plaintiff Charles King ("King") filed an Opposition,

to which Defendant has replied. F&D has also moved to strike two affidavits submitted in

opposition to its summary judgment motion: that of Plaintiff King and that of Barry Johnson.

Oral argument was heard on July 11, 2012, and the matters are now ripe for disposition. For the

reasons set forth below, F&D's Motions to Strike (ECF Nos. 169, 171) are **DENIED** and its

Motion for Summary Judgment (ECF No. 141) is **GRANTED**.

## I.    Factual and Procedural Background

As required when considering a motion for summary judgment, the facts are construed

in the light most favorable to King, the non-moving party. *See* Seabulk Offshore, Ltd. v. Am.

Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). A.O. Smith Automotive Products

Company ("A.O. Smith") produced steel components for the chassis of large "big rig" trucks.

Among its customers were Freightliner, Peterbilt, Mack, and Volvo. On August 17, 1995, A.O.

Smith entered into an Equipment Purchase Agreement ("Agreement") with F&D wherein A.O.

Smith ordered an industrial heat processing system from F&D to install at its facility in

1

Roanoke, Virginia. Def.'s Ex. 1, ¶ 8; Pl.'s Ex. 3. The heat processing system consisted of three major components: an Austentizing Furnance ("AF"), a Quench Machine ("Quench"), and a Tempering Furnace ("TF"). Attached to and made a part of the Agreement were proposals and drawings for each of these pieces of equipment, which were designated the "Specifications." The Agreement dictated that any requests by A.O. Smith to change the Specifications, as well as responses to those change requests, were to be made in writing. Finally, the Agreement contained a merger and integration clause, contemplating that it constituted the entire agreement between the parties. The heat treat system was manufactured, assembled and installed from September 1995 through December 1996. After being tested, it was accepted by A.O. Smith in March 1997.

The purpose of the heat processing system is to take relatively inexpensive, garden variety steel rails and convert them into high strength rails that were suitable for use in heavy truck chassis. The heat processing, or "heat treat" process is comprised of three basic steps. First, the steel rail is heated in the AF to temperatures of more than 1600 degrees Fahrenheit. Then, the hot steel is transported to the Quench, where it is doused with water that rapidly cools it to near room temperature. Because the rails are not cooled uniformily—not all the molecules contract or expand at the same rate—the rails may become distorted or bowed during the quenching process. When bowing or distortion occurs, it occurs immediately upon release of the tool dies that clamp the rail in the quench bed during the quenching process. Because the system is designed to transport flat rails, bowed rails fail to advance through the process, and sometimes require manual intervention.

2

After a rail is quenched, it is then ejected from the Quench to a Drag Chain.[1]  Hydraulic arms then lift the rail onto the tempering furnace charge conveyor ("TF Charge Conveyor"),[2] whereupon it travels into the Tempering Furnace ("TF").   The floor around the TF Charge Conveyor is slippery from grease and water; this slippery condition was known to many Metalsa employees, including King.  The TF Charge Conveyor consists of eleven rollers with sprockets on the ends, which are driven by a chain powered by a five-horsepower electric motor.  Once a steel rail reaches the TF, it is reheated to an intermediate temperature of less than 1300 degrees Fahrenheit, which usually ameliorates any distortions caused during the quenching process.  The rail is then discharged to a cool-down conveyor, and finally discharged for final custom modification before it is packaged for delivery to the plant's customers.

The TF Charge Conveyor is controlled from a nearby operator platform that contains a touch screen computer terminal that controls the heat treat line.  The TF Charge Conveyor has two modes:  automatic and manual.  In automatic mode, the TF Charge Conveyor, including the chain and sprocket system, is in constant motion at the rate of 1.6–1.7 feet per second.  By contrast, in manual mode, the TF Charge Conveyor stops moving.  An operator on the operator platform can move the conveyor forward or backward by repeatedly touching the monitor screen icon.  Operators at the plant, including King, knew how to place the TF Charge Conveyor in manual mode.

---

[1]. King's brief refers to this part of the system as the "Transfer Table." They are one and the same—the table used to transport rails to the TF Charge Conveyor. See Balaz Dep. 86–92. Various witnesses, and F&D, call it the Drag Chain, and in an effort to avoid confusion, the Court will adhere to the latter nomenclature.

[2] Again, King's Opposition brief refers to this part of the system as the "TF Entry Table" as opposed to the TF Charge Conveyor.  In every other part of the record, it is referred to as a conveyor.  In this Opinion, the "TF Entry Table" and "TF Charge Conveyor" are used interchangably.

3

A.O. Smith's plant in Roanoke was eventually taken over by Tower Automotive in April 1997, and then by Metalsa-Roanoke, Inc. ("Metalsa") in late 2000. King joined Metalsa in 2003, and transferred to the Heat Treat Cell in May 2006. Metalsa, or its predecessors, created a solution to deal with the problem of bowed rails. It trained its operators to use a specially-designated tool—basically, a 24-inch long pipe wrench—to manipulate bowed rails such that they could continue on through the system. King had manipulated bowed rails hundreds of times.

On September 29, 2006, King and a co-operator, Bill Freeman, were together on the control platform. They noticed that a bowed rail was transitioning from the Drag Chain onto the TF Charge Conveyor. The bowed rail was not moving. King, without knowing whether the TF Charge Conveyor was in automatic or manual mode, left the platform to address the bowed rail. In fact, the TF Charge Conveyor remained in automatic mode and was never placed in manual. King put his gloves on, retrieved the pipe wrench, and entered the fenced area which separated the operator platform from the machinery. Now within an arm's length of the TF Charge Conveyor, he hooked the pipe wrench onto the flange of the C-shaped bowed rail and pushed it forward into the TF. At this point, he was within inches of the spinning sprocket. As the front end of the bowed rail reached the first roller inside the TF (and while King's wrench was still lodged on the rail), the rail "kicked back," which caused the pipe wrench to strike King in the face. King then lost his footing on the wet floor. Afraid he would fall backwards, he instinctively reached forward, which caused his gloved left hand to get caught in the TF Charge Conveyor's running chain and sprocket. King reached to free his left hand with his right, but the sprocket caught that hand as well. As a result, King suffered severe and deforming injuries to both his right and left hands.

4

On September 17, 2008, King filed suit against F&D in the Circuit Court for the City of Roanoke. More than a year later, on October 7, 2009, F&D removed the action to this Court. On July 5, 2011, with leave of Court, King filed an Amended Complaint. On March 8, 2012, again with leave of Court, King filed a Second Amended Complaint ("SAC"), which is now the operative Complaint in this case. The SAC alleges causes of action for (1) negligent design of the heat treat system; (2) negligent failure to warn; (3) breach of the implied warranty of fitness for a particular purpose; (4) breach of the implied warranty of merchantability; (5) breach of an express warranty of safe operation and (6) breach of an express warranty of nonstop operation. F&D asks the Court to enter summary judgment in its favor, claiming that King is barred from recovery because (1) he confronted an open and obvious hazard; (2) he was contributorily negligent; (3) King's employer materially altered the heat treat system before his accident; (4) he assumed the risk; (5) he has not shown that F&D's product was unreasonably dangerous; (6) there were no express warranties of the type King claims; (7) any implied warranty of merchantability was contractually displaced; (8) King's employer was a knowledgeable user of the heat treat system; and (9) King's claims are untimely pursuant to the Virginia Statute of Repose. After receiving King's Opposition to its motion, F&D also moved to strike King's affidavit, as well as that of Barry Johnson, submitted in opposition to summary judgment.

## II.     Standard of Review

"[T]he function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition." Bland v. Norfolk & S. R. R. Co., 406 F.2d 863, 866 (4th Cir. 1969). In considering a summary judgment motion, the Court views the facts, and any inferences to be drawn from

5

those facts, in the light most favorable to the nonmoving party. *See* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Summary judgment is appropriate where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, summary judgment may be sought as to the entirety of a claim or defense or part of a claim or defense. *Id.*

A genuine issue of material fact exists where reasonable jurors could find that the nonmoving party is entitled to a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of showing the lack of a genuine dispute as to the material facts in the case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a motion for summary judgment is properly made and supported, however, that burden shifts to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A moving party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). But "[e]ven where summary judgment is appropriate on the record so far made in a case, a court may properly decline, for a variety of reasons, to grant it." Forest Hills Early Learning Ctr., Inc. v. Lukhard, 728 F.2d 230, 245 (4th Cir. 1984). *Accord* Andrew v. Clark, 561 F.3d 261, 271 (4th Cir. 2009) (recognizing advisory committee notes affording district court discretion even where summary judgment standard is met). Finally, since the relevant events in this case occurred in Virginia, the claims in this action are based on state law, and this Court's jurisdiction is based on diversity of citizenship, the Court applies the substantive law of Virginia. Seabulk Offshore, 377 F.2d at 418. *See generally* Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

6

Affidavits or declarations used to support or oppose a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Where an affidavit submitted in support of or in opposition to a motion for summary judgment flatly contradicts the affiant's prior sworn testimony, the Court may decline to consider the affidavit as part of the summary judgment record. *See* Rohrbough v Wyeth Labs., Inc. 916 F.2d 970, 975 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

### III.     Discussion

> Under products liability law, recovery . . . against a manufacturer for an injury caused by its product can be an elusive, complex, and difficult concept, especially because of the many terms and defenses and other rules established for [Virginia] products liability, and because of the resulting inconsistent, if not conflicting, precedent.

Batts v. Tow-Motor Forklift Co., 978 F.2d 1386, 1389 (5th Cir. 1992).

#### A.  Motions to Strike

##### 1.  Affidavit of Charles King

The Court first takes up F&D's motions to strike. First, F&D moves to strike King's Affidavit, submitted in Opposition to F&D's Summary Judgment Motion. *See* Ex. 17 to Pl.'s Opp. In his affidavit, King swears to the following

> The wrench striking me in the face caused me to lose my balance which caused me to, instinctively, reach out for support. **I did not slip and fall. The condition of the floor where I was standing did not have anything to do with my loss of balance or my hands getting pulled through the chain and sprocket.** I sustained contusions and lacerations to my face as a result of being struck by the wrench.

King Aff. ¶8 (emphasis added). F&D argues that his entire affidavit must be stricken, because he has elsewhere sworn, including in interrogatories and in deposition testimony, that he slipped. *See, e.g.*, King Dep. 91–92. The Court understands that King's version of events is that he

7

utilized the pipe wrench to manipulate the bowed rail; the wrench kicked back and hit him in the face. He lost his balance, and in an effort to catch himself, got his hands caught in the chain and sprocket. Whether that constitutes a "slip" is nothing more than a quibble over semantics. Having reviewed the motion, the opposition thereto, and related exhibits, the Motion to Strike the Affidavit of Charles King is **DENIED**.

### 2. Affidavit of Barry Johnson

Second, F&D moves to strike the affidavit of Barry Johnson, claiming that various aspects of his affidavit are not based on personal knowledge. Johnson was the engineering manager at A.O. Smith; while the affidavit may not have met each and every technical requirement of Rule 56(c), the Court is satisfied that the affidavit substantially complies with the Rule and that Johnson has sufficient personal knowledge to testify to the specific matters objected to by F&D. Accordingly, this motion is also **DENIED**, and both the King and Johnson affidavits were utilized in the Court's consideration of F&D's Motion for Summary Judgment, which it turns to now.

### B. Summary Judgment

### 1. Open and Obvious Hazard

F&D first contends that King cannot recover for his injuries because they were caused by an open and obvious hazard. According to F&D, the combination of a slippery floor and a running, unguarded chain and sprocket system, to which King was in close proximity, constitutes an open obvious hazard of which King should have been aware. Under Virginia law, "a plaintiff may not recover damages for breach of an implied warranty if the purported defect of which the plaintiff complains was known, visible, or obvious to him." Wood v. Bass Pro Shops, Inc., 462 S.E.2d 101, 103 (Va. 1995) (quoting Brockett v. Harrell Bros., Inc., 143 S.E. 2d 897,

902 (Va. 1965))(internal quotation marks omitted). Similarly, a successful open and obvious defense will also bar recovery for claims rooted in negligence. *See* Freeman v. Case Corp., 118 F.3d 1011, 1014 (4th Cir. 1997). Thus, if the Court concludes, as a matter of law, that the hazard was open and obvious, all of King's claims must be dismissed.

King does not dispute the existence of these facts. Rather, King urges the Court to distinguish between the *defect* and the *hazard.* The hazard, King posits, was the recoil from his manipulation of the bowed rail; this recoil could not have been open and obvious to a reasonable person. According to King, "the defect was the failure of the unguarded TF Entry Table to convey bowed rails, but the resulting hazard was the sudden and unexpected kickback caused by the rail jamming into the roller." Pl.'s Opp. 19. The kickback that occurred when the rail jammed into the roller when he tried to manipulate it with the pipe wrench, King maintains, was not open and obvious. In support of this theory, he submits the expert report of Dr. Farhad Booeshaghi. Dr. Booeshaghi, a mechanical engineer, opines that the sudden and unexpected kickback of the rail caused by the bowed rail hitting the first roller and kicking back, as well as the nip point created by the chain and sprocket were latent hazards unknowable to the ordinary person. Pl.'s Ex. 28, ¶¶2–4.[3]

King relies on Morgen Industries, Inc. v. Vaughan, 471 S.E.2d 489 (Va. 1996). In Morgen Industries, the plaintiff was an employee of Misener, a construction concern. As part of its work in building a portion of a bridge tunnel, Misener had purchased several large Morgen conveyor units to transport wet concrete along a track. Each conveyor unit consisted of a large

_____

[3] King also submits the expert report of Dr. David Thompson, who opines that King did not perceive that he was putting himself at risk and that "by no means was it an 'open and obvious' hazard." Pl.'s Opp. 22; Pl.'s Ex. 37. But the inquiry on the open and obviousness defense is an objective, and not a subjective, one. What King subjectively perceived is not relevant to the analysis. Moreover, Dr. Thompson's *legal conclusion* as to whether the hazard was "open and obvious" will not be accorded any weight.

9

rectangular-shaped bin mounted on a wheeled undercarriage. This system, whereby a motor was used to move the conveyor units back and forth along the track in order to deliver concrete from the concrete mixing site to the site of the bridge spans, apparently worked well until the day of the plaintiff's injury, whereupon tragedy ensued:

> Misener's employees regularly cleaned the conveyor system. The employees sprayed the system with water and then "chipped off" cement that had dried and become affixed to the conveyor components. Misener's employees regularly stood on the rails in order to clean certain parts of the conveyor system. Misener did not warn its employees not to stand on the rails while cleaning the conveyor units.
>
> On the day Vaughan was injured, the machines were scheduled to remain stationary for cleaning. In a departure from the established routine, another employee activated the side discharge unit without warning, setting the undercarriage wheels of the conveyor units in motion. Vaughan's foot was pinned between a moving wheel and the undercarriage rail. Her foot was trapped in the "nip point" where the wheel and the rail met. Vaughan was unable to move her foot and the wheel rolled over her foot, ankle, and leg. While her foot was still pinned by the wheel, she fell off the rail, sustaining multiple fractures of both her tibia and her fibula.

Morgan Indus., 471 S.E.2d at 491. The Virginia Supreme Court found that since there was conflicting evidence as to whether the "nip points" were an open and obvious hazard, pointing again to the expert testimony of a mechanical engineer, who stated that while the hazard of nip points was well known to those in his field, they are not dangers that are obvious to most people . Id. at 491–92.

King also points to the Fourth Circuit's decision in Freeman v. Case Corp., 118 F.3d 1011 (4th Cir. 1997) which ultimately controls here. Judge Glen Williams aptly summed up the relevant facts in his opinion below:

> Upon receiving his Case 1130 [tractor], [Plaintiff] Freeman examined portions of the accompanying manual, and also inspected the tractor itself. Prior to the accident, he had mowed his yard twice and spread fertilizer once with the tractor. On the day of his injury, Freeman was not using the seat belt. While mowing near a steep embankment in his back yard, Freeman drove the tractor over a partially buried boulder. Although the Deere [his previous tractor] had never done so, the mower blades of the Case 1130, being set slightly lower, struck the top of the boulder. Freeman immediately stopped the

10

tractor, depressed the clutch to disengage power to the blades and the wheels, and raised the mower deck so that the blades would not strike the rock when restarted. His plan was to then release the clutch to spin the blades in the air, in order to determine if they had been warped by striking the rock. Freeman claims that his foot was on the brake pedal, which is located in close proximity to the speed ratio control pedal ("SRC"). He in fact had both the brake and the SRC depressed. Thus, when he released the clutch, the tractor moved forward over the edge of the embankment. Freeman was unable to stop or to regain control of the tractor. He leapt from the machine, but was struck by the blades and severely injured as the tractor rolled down the hill.

Freeman v. Case Corp., 924 F.Supp. 1456, 1461 (W.D. Va. 1996). The case proceeded to trial; the jury found in favor of the plaintiff and awarded him $3.8 million in damages. *Id.* at 1460. After the verdict, Case brought a renewed motion for judgment as a matter of law, which the district court granted, finding, *inter alia*, the proximity of the pedals and the absence of the operator presence control device were open and obvious hazards of which the plaintiff should have been aware. The Fourth Circuit reversed, finding that the *hazard* was not the proximity of the pedals and the absence of a control device. Rather, it concluded, the hazard was that "the pedals could easily be inadvertently coengaged and that coengagement could cause the mower to lurch because the brakes would not override the SRC," and that this hazard was "far from obvious," Freeman, 118 F.3d at 1015, especially in light of testimony from the plaintiff's expert that the brakes should have overpowered the SRC if an operator simultaneously pushed both pedals. The court found that the expert testimony alone "would prevent a conclusion as a matter of law that the hazard caused by the brake's failure to override the SRC was 'obvious.'" *Id.*

"[W]hen the defect is of such a character that reasonable and prudent [persons] may reasonably differ as to whether an accident could or should have been reasonably anticipated from its existence or not, then the case is generally one for the jury." Fultz v. Delhaize Am., Inc., 677 S.E.2d 272, 274–75 (Va. 2009) (internal quotation marks omitted). Here, although the call is a close one, in light of Dr. Booeshaghi's opinion, King has submitted enough "conflicting

11

evidence" to survive summary judgment on this issue. Ultimately, under existing Virginia Supreme Court and Fourth Circuit precedent, the Court is not convinced that F&D can be awarded summary judgment on the open and obvious defense *per se*.

### 2. Contributory Negligence

F&D next argues that King cannot recover because he was contributorily negligent. While the open and obvious defense and the contributory negligence defense are related, they are not the same. The open and obvious defense focuses on the hazard itself; by contrast, a contributory negligence analysis revolves around the conduct of the plaintiff. In Virginia, contributory negligence is a complete bar to recovery in a negligence action. Smith v. Va. Elec. & Power Co., 129 S.E.2d 655, 659 (Va. 1963). *See also* Flakne v. Chesapeake & Potomac Tel. Co. of Va., 97 S.E.2d 650, 652 (Va. 1957) ("One cannot charge another in damages for negligently injuring him when his own failure to exercise due and reasonable care was responsible for the occurrence of which he complains."). King cannot recover if he "failed to act as a reasonable person would have acted for his own safety under the circumstances." Artrip v. E.E. Berry Equip. Co., 397 S.E.2d 821, 824 (Va. 1990). This is an objective, and not a subjective standard. Kelly v. Va. Elec. & Power Co., 381 S.E.2d 219, 223 (Va. 1989). Additionally, in order for a plaintiff to be charged with contributory negligence, that negligence must have been a proximate cause of the plaintiff's accident. *See* Litchford v. Hancock, 352 S.E.2d 335, 337 (Va. 1987). "Generally, questions of negligence and contributory negligence are for the jury . . . but where reasonable men may draw but one inference from the facts, they become questions of law for the court." Smith, 129 S.E.2d at 659. *Accord* Kelly, 381 S.E.2d at 222 ("Ordinarily, the issue of contributory negligence is a question for the jury. Nevertheless, when persons of reasonable minds could not differ upon the conclusion that such negligence has

12

been established, it is the duty of the trial court so to rule."). F&D argues that by leaving a place of safety, that is, the operator's station, failing to place the machine in automatic mode, and utilizing a pipe wrench to manipulate a bowed rail while standing on a slippery surface, King failed to act as a reasonable person would under the circumstances of the case.

Here, the evidence shows that King did not assure that the TF Charge Conveyor was in manual mode before stepping down from the platform. According to King, when he left the control platform, he did not know whether the equipment was in manual or automatic mode, and that once he left, he was no longer in control of the setting. King Aff. ¶ 7. But once he came down from the platform, and before he used the pipe wrench to manipulate the bowed rail, it was patently obvious to him that the machine was in automatic mode. *See* King Dep. 5–6, 8. He could have returned to the platform and asked Freeman to assure that the machine was in manual mode; he did not. Rather, after he stepped down from the platform, observed an operational machine, including a moving chain and sprocket system. He then entered the gated area, past the barrier fence, while the TF Charge Conveyor was in automatic mode. At this point, King was standing between 18 and 24 inches away from the moving chain and sprockets. King Dep. 78. He then attached a pipe wrench to the flange of a bowed rail, reaching *over* the chain and sprockets to do so. *See* Def.'s Ex. 145 (Plaintiff's expert's schematic of accident scenario). When King was holding the wrench over the chain and sprockets, the end of the wrench extended only about ten inches over the sprockets. Booeshaghi Dep. 81. Then, while standing on a slippery floor, he used the pipe wrench to try to push the bowed rail into the TF.

King responds that if the Court decides that he is contributorily negligent, it "would have to conclude as a matter of law that King's supervisors and co-workers were all unreasonable in teaching him to do exactly as he did and exactly as they had done for 10 years without such an

incident. The Court would also have to disregard the expert testimony in this case as to the latent danger of the chain and King's reasonable belief as to his own safety." Pl.'s Mem. in Opp. 29. Specifically, he argues that his experts "will testify that under the circumstances it was reasonable for him to believe that he could perform the manipulation of the subject rail safely and without incident," citing to the report of Dr. Thompson. *Id.* at 38. Dr. Thompson is a civil engineer; his expertise is in whether he may qualify as an expert on the issue of the conduct of reasonable persons is doubtful. But more importantly, as the Supreme Court has explained, "[w]hen an expert opinion is not supported by sufficient evidence to validate it in the eyes of the law, or when indisputable record facts render the opinion unreasonable, it cannot support a jury verdict." Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). And where the opinion cannot support a jury verdict, it cannot properly be used to oppose summary judgment. *Accord* Major League Baseball Props. v. Salvino, Inc., 542 F.2d 290, 311 (2d Cir. 2008) ("entirely conclusory" expert report cannot ward off summary judgment). Having reviewed Dr. Thompson's expert report, the only real basis for his conclusion that King's conduct was reasonable was that no operator had previously been injured in the process. Pl.'s Ex. 37 at 5. Dr. Thompson also concludes that running the TF Charge Conveyor in manual mode would not have prevented or mitigated King's injuries, *id.* at 8–10. But that opinion is based on the assumption that Freeman would have been constantly jogging the conveyor to the point where it would be moving at the rate of 1.6–1.7 feet per second, the same as in automatic mode, while King held the pipe wrench over the pipe. This assumption has no basis in the record. *See, e.g.,* Snay Dep. 79 ("Jogging is the process of pushing [the rail] forward in a *slow, controlled fashion* . . . . Once you took your finger off, as quickly as the signal got to the motor to stop it, it would stop." (emphasis added))

14

It is true that "an employee who is injured while performing a job in accordance with instructions provided by the employer is not guilty of contributory negligence unless the danger is so apparent that no reasonable person would encounter it." Jones v. Meat Packers Equip. Co., 723 F.2d 370, 372–73 (4th Cir. 1983) (citing Norfolk & Western R.R. v. Ward, 19 S.E. 849, 850 (Va. 1894)). F&D has presented evidence that at least as of 1998, the policy at the Roanoke plant was such that when a rail became bowed and would not convey, operators such as King were not to enter beyond the barrier fence while the machine was in automatic mode. Keuster Dep. 52. F&D also points the Court to its Exhibit 24, which is Metalsa's Procedure for Charging Bowed Rails in the Tempering Furnace. As relevant here, the procedure is as follows:

> 5. One operator must place the TF Charge Conveyor in manual by going to the Panel View screen and selecting Tempering Furnace.
> 6. From [the Panel View] screen, the TF Charge Conveyor is selected and then the conveyor is placed into Manual by selecting the manual button at the top right of the screen.
> 7. One operator must stay at the Panel View to keep control of the conveyor.
> 8. No one is to be inside the safety gates at any time while conveyor is in automatic.

Def.'s Ex. 24. This testimony was supported by Darrin Snay, who said that before King's accident, Metalsa had a policy whereby operators were not to enter a gated area while the machine was in automatic. Snay Dep. 78. Tony Plunkett, a maintenance area supervisor who still works at the Metalsa plant, recalled a safety rule, in place well before King's accident, that no one should ever be inside the fence while the machine was in automatic mode. Plunkett Dep. 23. According to Dennis Custer, "[e]veryone in both facilities [including King] was trained with an emphasis on not entering a gated area while a machine was in automatic." Custer Dep. 88. Custer continued, "Operators are not to enter a gated area while the machine is in automatic . . . . This was to be a two-man operation while the machine was in manual, jogging the conveyor forward while the other operator is assisting it, with this pipe wrench." Id. at 78:13–14. When

15

the machine was placed in manual mode, the chain and sprocket would stop moving nearly immediately. *Id.* at 79. Another former operator, Gregory Dyer, who left the plant about February 2004, testified that he was "trained to keep the machine in automatic to get the rails in [the TF], *but if it didn't load all the way, had to throw everything in manual*." Dyer Dep. 11:6–8 (emphasis added). This was confirmed by the testimony of Michael McDaniel, Metalsa's Rule 30(b)(6) witness, McDaniel Dep. 125–26, and its safety consultant, Timothy Fitzgerald. Fitzgerald Dep. 196–97. [4]

King responds that the Special Process Instruction ("SPI") relating to the bowed rails policy was not disseminated until October 3, 2006, in the days *after* King's accident. *See* Def.'s Ex. 24 at 3. F&D concedes this. But the date of the SPI simply explains the date it was loaded into the Qualtrak computer system. Snay, whose signature appeared on the SPI, testified that it was a standing procedure at the time King was hired and that it was likely posted at the operator's station. Snay Dep. 82–83.

King claims he "did it the way [he] was trained," King Dep. 7:23–24, and disputes that Metalsa had a safety rule requiring the conveyor to be put in manual before entering the gate. *Id.* at 6:4–9. But when asked about the training he had received relative to the heat treat cell, King replied: "Just, you know, basic training that everybody gets up there from each other." *Id.* at 53. To be sure, King has submitted some evidence that there was no policy one way or the other. For example, Dyer also testified that during his time at the plant, there was no absolute rule as to whether the machine had to be placed in manual mode when an operator got within a certain

---

[4] Incidentally, immediately after King's accident, Snay spoke with Bill Freeman, King's co-operator who remained on the platform at the time of the accident. Freeman said, "I should have put it in manual. I wish I had put it in manual." Stmt. of Bill Freeman, Sep. 29, 2006, Def.'s Ex. 34. Similarly, in a statement just a few days after the accident, King admitted, "We should have put it in manual—I wish we would have put it in manual . . . . where I really messed up was not having it in manual." Stmt. of Charles King, Oct. 1, 2006, Def.'s Ex. 35.

distance of it. Rather, he claimed that it was a "judgment call." Dyer Dep. 50:14–15. Carey Walker, another operator said that there was no "safety rule or work rule about approaching moving equipment that was in automatic mode." Walker Dep. 41:11–14. Bill Freeman, King's co-operator on the day of the accident, testified that he didn't believe that he or King had violated any safety rules on the day of the accident. Freeman Dep. 77. He also testified he did not put the machine in manual mode because he did not think the rail was bowed severely enough, and that King's actions on the day of the accident were consistent with his training. *Id.* at 78, 81. But somewhat contradictorily, Freeman also indicated that when a rail was bowed, he was trained to put the system in manual mode. *Id.* at 35.

Even taking all of King's evidence as true, the most favorable inference to be drawn is that there is a dispute as to whether, at the time of King's accident, Metalsa had a published rule preventing operators from going near the machine when it was in automatic mode. Apart from generalized statements about how he acted in conformity with his training, King has not brought forth a scintilla of evidence that Metalsa affirmatively instructed its operators to keep the machine *in automatic mode* while attempting to manipulate bowed rails.[6] This is not enough to survive summary judgment. *See generally* Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (no genuine issue of material fact where only evidence is "uncorroborated and self-serving" testimony); Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000) (self-serving affidavit insufficient to survive summary judgment).

---

[6] There is evidence in the record tending to show that some other operators, when dealing with mild to moderately bowed rails, may have had a custom or practice of declining to put the TF Charge Conveyor in manual mode before manipulating a bowed rail with the pipe wrench. But "custom or usage cannot excuse conduct which is otherwise negligent where . . . the custom or usage itself is not reasonably safe or adequate for its purpose and occasion." Reed v. Carlyle & Martin, Inc., 202 S.E.2d 874, 877 (Va. 1974) (internal quotation marks omitted). In other words, King's actions do not become reasonable simply because his coworkers also acted unreasonably.

17

Moreover, the chance of a kickback was apparent to any reasonable person. It is common knowledge that pushing against an object, especially a large metal object, may elicit resistance or reaction. Moreover, it was known to employees at the plant that bowed rails sometimes kicked back. *See* Holder Dep. 24–26; Grim Dep. 191-92. In Jones, the Fourth Circuit reversed the district court's submission of contributory negligence to the jury where an employee put her hand in a machine to clean it *after* the "Stop" button had been pressed and the machine had come to a complete halt. 723 F.2d at 373. Here, exactly the opposite was true. King stepped inside the gate, put himself within inches of a moving, heavy duty conveyor system while on a slippery floor, and pushed on a large steel rail with a 24-inch pipe wrench. At the very least, a reasonable person, under these circumstances, would have ensured that the machine was in manual mode before attempting to manipulate the bowed rail. This, King failed to do. Under Virginia law, he is guilty of contributory negligence and thus barred from recovery on a negligence theory. The motion is **GRANTED** as to King's negligent design and negligent failure to warn claims.

### 3. Warranties

#### a. Whether the TF Charge Conveyor was Included in the Scope of Supply of the Agreement.

Next, the Court addresses King's warranty claims. As a threshold matter, the parties disagree as to whether the TF Charge Conveyor was included as part of the Agreement. F&D says it was not part of its contractual obligation, and that rather it just provided the conveyor for free. King maintains that it was part of the sales agreement between F&D and A.O. Smith. The relevance of this is two-fold. First, if the TF Charge Conveyor was not part of the Agreement, then it is not covered by any express warranties contained therein. Second, the Uniform Commercial Code, from which King's implied warranty claims arise, is only applicable to the

Case 7:09-cv-00410-JCT-RSB   Document 205   Filed 07/30/12   Page 18 of 23   Pageid#: 3804

sale of goods. A sale of goods, in turn, requires "the passing of title of goods from the seller to the buyer for a price." Moore v. Allied Chemical Corp., 480 F.Supp. 364, 375 (E.D. Va. 1979). Thus, if F&D can show there is no genuine issue of material fact as to whether the TF Charge Conveyor was a "good" that was "sold," then King's warranty claims must be dismissed.

The "Specifications for the Tempering Furnace," made part of the Agreement, states that "The charge table with rolls will be supplied by the Purchaser [A.O. Smith]." *See* Specs. attached to Equipment Purchase Agreement ("Agmt."), Proposal 8925-B2, at 3. Additionally, Joseph Balaz, who negotiated the Agreement for F&D, declared that while the TF Charge Conveyor was later provided by F&D, it was not within the scope of the Agreement, and F&D was not compensated for providing it. Balaz Decl. ¶9–10.[8]

King responds by pointing to the following language from the Agreement, which states that the defendant would supply and install a "temper furnace entry table." Pl.'s Opp. 40. But King's quotation is from the scope of supply from the Quench. *See* Specs. attached to Agmt., Proposal 8925-C2, §101(1). But this language is irrelevant to the question of whether the TF Charge Conveyor was part of the Agreement.

King tries to save the warranty claim arguing in the alternative that the contract is ambiguous, and thus should be submitted to a jury. But simply because something is complicated and cumbersome (and in this case, all can agree that the Agreement is) does not make it ambiguous. Here, the design specifications for the tempering furnace unambiguously state that the charge table will be provided by the Purchaser. King has submitted no evidence of his own to contradict this. Rather, he offers a *res ipsa loquitor* argument—since F&D provided the TF conveyor, King reasons, it must have viewed itself as contractually obligated to do so.

---

[8] F&D does admit that "the circumstances under which the TF Charge Conveyor was provided are unclear." Def.'s Mem. in Supp. 43.

This is pure speculation. Under Virginia law, a court must construe the clear and unambiguous

terms of a contract pursuant to their plain meaning. Bridgestone/Firestone, Inc. v. Prince William

Sq. Assoc., 463 S.E.2d 661, 664 (Va. 1995). Accordingly, F&D is entitled to summary judgment

on the warranty claims as well.

### b. Express Warranty

Even if the TF Charge Conveyor *were* included in the scope of the Agreement, however,

King's warranty claims would still fail. While it is not explicitly expressed in the SAC, the

parties appear to agree that the express warranty claim focuses on the following language in the

contract between F&D and A.O. Smith:

> It is understood by Seller [F&D] that Buyer [A.O. Smith] intends to use the Equipment
> for the purposes generally described in the documents attached as Exhibit A. The
> Equipment may be run on a 24 hour per day basis with stoppage only for the required
> preventative maintenance reasonably specified by the Seller.
> . . . .

[T]he Equipment will be fit for the use identified in Paragraph B of Section 5.

Equipment Purchase Agmt. ¶¶4, 8, Ex. B to Balaz Decl. ("Agmt.") [9] *See also* SAC ¶¶11, 48;

Def.'s Mem. in Supp. 46. F&D argues that this language, by itself, cannot form the basis for an

express warranty under these facts. That is, its promise to A.O. Smith that the Equipment "may

be run on a 24 hour per day basis," by itself, does not create any duty on its part. King responds

that, at the very least, this language is ambiguous and is a question of fact to be decided by a

jury. But even assuming, as King contends, that the above-quoted language created an express

warranty, any such warranty lasted only 12 months from the date of A.O. Smith's acceptance of

the equipment. Agmt. ¶ 3.K ("Warranty Period: Shall mean the period which begins on the

Acceptance Date and ends 12 months later"). King's accident occurred in September 2006;

---

[9] As F&D points out, "Section B of Paragraph 5" should be "Section B of Paragraph 4." Def.'s Mem. in
Supp. 46 n.13.

evidence indicates that the Acceptance Date was March 1997. Therefore, King cannot claim that F&D violated its express warranty, and F&D is entitled to summary judgment on this ground.[10]

### c. Implied Warranty

The 12-month limitation also applied to King's implied warranty claims.[11] Virginia's adoption of the Uniform Commercial Code presumes that any commercial contract for the sale of goods carries with it an implied warranty of merchantability, assuming the seller is a merchant with respect to goods of that kind. Va. Code Ann. § 8.2-314 (2012). In order for goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." *Id.* §8.2-314(2)(c). Here, the parties do not dispute that F&D qualifies as a "merchant with respect to goods of that kind" with respect to the equipment it furnished A.O. Smith. Rather, the crux of their disagreement revolves around whether the Agreement properly excluded or modified F&D's implied warranty of merchantability. In order to exclude or modify the implied warranty of merchantability, the exclusion or modification "must mention merchantability and in case of a writing must be conspicuous." Va. Code Ann. § 8.2-316 (2012). F&D relies on the following

---

[10] King argues that the 12-month limitation should not be recognized because it is unconscionable as applied to him, an unsophisticated layperson. But this argument is without merit, as it makes a crucial logical jump. It is true that Virginia has abolished the privity requirement for breach of warranty claims. And it is also true that the Court will not enforce a contract which it finds to be unconscionable. But in performing the unconscionablity analysis, the Court's duty is to compare the relative positions of the parties that entered into the original contract. *See* Reibold v. Simon Aerials, Inc., 859 F.Supp. 193, 199 (E.D.Va. 1994). Here, those parties were A.O. Smith and F&D. By all accounts, A.O. Smith was a sophisticated purchaser of industrial equipment that had negotiated several sales contracts regarding equipment at various locations throughout the country. There is no evidence in the record indicating any significant disparity in power between the two contracting parties as to render the contract between them unconscionable.

[11] King also appears to plead a claim for violation of the implied warranty of fitness for a particular purpose. *See* SAC ¶ 47. But it has presented no evidence from which a reasonable factfinder could conclude that A.O. Smith was relying on F&D's skill or judgment to select or furnish suitable goods. *Cf.* Va. Code Ann. § 8.2-315 (2012) (circumstances under which implied warranty of fitness arises). In fact, the record reveals the opposite: A.O. Smith had developed the heat treat process, and F&D created a heat treat system in conformity with A.O. Smith's specifications.

language in support of its claim that the implied warranty of merchantability was properly excluded: "Seller warrants that . . . the Equipment will be merchantable, of good material and workmanship and free from defects throughout the Warranty Period." Agmt. ¶ 8.A. This language appears in the same font, size, and typeface as the text surrounding it. While it mentions merchantability, it is certainly not conspicuous. *See, e.g.*, Va. Code Ann. § 8.1-201(10) (2012) (defining "conspicuous" and listing examples).

F&D responds that the restrictions on conspicuousness do not apply, because the express warranty of merchantability *displaced* rather than *excluded or modified* the implied warranty of merchantability. *See* Va. Code Ann. § 8.2-317(c) (2012) ("Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."). The question for the Court, then, is whether the language in the Agreement pertaining to merchantability excluded or modified the implied warranty of merchantability, on the one hand, or displaced the implied warranty of merchantability, on the other hand. One court has described the distinction as follows: "By disclaiming a warranty, a party may seek to limit their contractual liability by reducing the number of situations in which the seller can be in breach of the warranty. By limiting or excluding remedies, a party only restricts remedies available once a breach has been established." Reibold v. Simon Aerials, Inc., 859 F.Supp. 193, 197 (E.D. Va. 1994). *See generally* Fournier Furniture, Inc. v. Waltz-Holst Blow Pipe Co., 980 F.Supp. 187, 190 (W.D. Va. 1997) (express warranties preclude implied warranties where they contain same subject matter), Here, the 12 month warranty period was a limitation in time rather than in scope. Accordingly, F&D was not bound by the conspicuousness limitations. For all these reasons, summary judgment is also **GRANTED** as to King's warranty claims.

## IV.    Conclusion

One certainly has a lot of sympathy for the plaintiff in this case.  The Court has met Mr. King; he is an honorable, proud, hard-working man who suffered a terrible injury.  He would like nothing more than the opportunity to return to work.  But the Court would not be doing him any favors if it permitted him to endure a multi-week trial that could not, as a matter of law, ultimately produce a favorable result.  For better or for worse, Virginia has retained the minority rule of contributory negligence.  Additionally, it is one of just a few states in the Union that does not recognize the concept of strict liability in tort in most cases.  Under the circumstances of this case, and under binding precedent, the Court has no choice but to dismiss King's claims.

For the foregoing reasons, F&D's Motions to Strike (ECF Nos. 169, 171) are **DENIED** and its Motion for Summary Judgment (ECF No. 141) is **GRANTED**.  An appropriate Order shall issue this day.

**ENTER**: This _30_th day of July, 2012.

_James C. Turk_
Senior United States District Judge

23